AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

United States of America
v.

Case No. 2:21-mj-349

Noe Martin BARRON
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of 04/08/2021 in the county of Franklin in the Southern District of Ohio , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21 USC Section 846, Title 21 USC Section 841 (a)(1), and (b)(1)(A)(viii) | Conspiracy to Possess and Distribute more than 50 grams or more of a mixture and a substance containing methamphetamine |

This criminal complaint is based on these facts:
See Attached Affidavit

☒ Continued on the attached sheet.

*Complainant's signature*

DEA Special Agent Christopher Cadogan
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-19-21

*Judge's signature*

City and state: Columbus, Ohio

FOR CHELSEY M. VASCURA, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Christopher Cadogan, having been duly sworn, state the following:

## INTRODUCTION

1.      Your Affiant is a Special Agent with the Drug Enforcement Administration (DEA) and has been so employed for approximately twenty-four years. I am currently assigned to Group Four of the DEA's Columbus District Office.  This group is currently comprised of narcotics investigators from the DEA and the Columbus Police Department. Group Four was designed, in part, to target individuals and groups involved in the manufacture and distribution of methamphetamine, cocaine, heroin, and fentanyl in Franklin County, Ohio.  Prior to being employed by the DEA, I was employed for approximately two and one-half years as a Border Patrol Agent.  As a Border Patrol Agent I was cross-designated to make federal arrests of individuals in violation of Title 21 of the United States Code.  For more than twenty-six years, I have had the authority to make federal drug arrests.

2.      As a DEA Special Agent, Your Affiant has participated in hundreds of narcotics investigations involving various types of controlled substances.  I have received substantive advanced training pertaining to the investigation of various crimes which arise from narcotics trafficking, including money laundering, the use of interstate transportation in the furtherance of narcotics trafficking, the use of the United States Postal Service facilities in furtherance of narcotics trafficking, and the use of telecommunications facilities in the furtherance of narcotics trafficking.  I have participated in investigations involving the purchase of controlled substances from suspected narcotics traffickers using both undercover narcotics investigators and confidential sources.  I have participated in the drafting and execution of search warrants for narcotics, proceeds from the sale of narcotics, documentary evidence of narcotics trafficking, and for the telecommunications devices used by narcotics traffickers.  I have conducted surveillances in connection with narcotics investigations.  I have authored five affidavits supporting federal wire and electronic intercepts of known and suspected narcotics traffickers.

3.      Through the course of these investigations, I have personally interviewed confidential sources, and other persons, involved in the distribution of illegal narcotics. I have also interviewed persons arrested for the distribution of illegal narcotics.  I have spoken with more experienced narcotics investigators with whom I have worked concerning the practices of narcotics traffickers and the best investigative methods to use when conducting investigations of narcotics trafficking organizations.  Through the course of my investigations and through my conversations with more experienced narcotics investigators, I have become familiar with the methods and means utilized by persons who participate in the illegal distribution of controlled substances.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is made in support of an application for a federal arrest warrant and criminal complaint against Noe Martin BARRON, AKA "Cali", for conspiring with others, both known and unknown, to possess with the intent to distribute 50 grams or more of a mixture and a substance containing methamphetamine, a schedule II controlled substance, in violation of Title

1

21, U.S.C. § 841 (a)(1) and (b)(1)(A) (viii) and Title 21, U.S.C. § 846. My knowledge of this investigation is based upon my own personal observations, as well as the observation and investigation conducted by other law enforcement officers knowledgeable of the facts and circumstances involved in the subject investigation. I have not included in this Affidavit all the facts known to me, but only that information sufficient to establish probable cause to believe that Noe Martin BARRON committed a violation of Title 21, U.S.C. § 841 (a)(1) and (b)(1)(A)(viii) and Title 21, U.S.C. § 846.

## SUMMARY OF PROBABLE CAUSE

5.      On Following a series of telephone calls and text messages between a DEA confidential source, hereafter referred to as the CS, and known methamphetamine and fentanyl distributor Dalton Ray FANNIN, arrangements were made for DEA Special Agent (SA) Antonio Kelly, acting in an undercover capacity, to meet with FANNIN sometime before noon on April 8, 2021. The purpose of the meeting was for SA Kelly to purchase four (4) ounces of methamphetamine from FANNIN. According to the CS, FANNIN had agreed to sell SA Kelly four (4) ounces of methamphetamine for $2,400.00 in U.S. currency. According to the CS, FANNIN, AKA "Larry", advised the CS to have his/her business associate (SA Kelly) contact him once he was "in town and ready to go" on FANNIN's cellular telephone, telephone number (845) 269-2089. The CS has, in the past, provided DEA with information which was later corroborated through independent investigation. The CS is considered to be reliable.

6.      On April 8, 2021, plans were formulated at the DEA's Columbus District Office for DEA Special Agent (SA) Antonio Kelly to meet with FANNIN later that day, for the purpose of purchasing four (4) ounces of methamphetamine.

7.      On April 8, 2021, SA Kelly was provided with $2,400.00 in official advanced funds (OAF) with which to purchase the purported methamphetamine. SA Kelly was also equipped with a digital recording device in order to record the anticipated conversation between SA Kelly and FANNIN. In addition to the recording device, SA Kelly was equipped with two transmitting devices which were subsequently monitored by DEA Task Force Officer (TFO) Kevin Wangler over his cellular telephone and Your Affiant over a police radio.

8.      On April 8, 2021, at approximately 11:00 a.m., DEA TFOs Bryan Mason and Brian Daron established surveillance of FANNIN's residence located at 370 Whitethorne Avenue.

9.      At approximately 11:17 a.m., FANNIN texted SA Kelly and advised him that he (FANNIN) was not yet in possession of the methamphetamine that he had earlier agreed to sell SA Kelly. According to FANNIN, his source was currently in court.

10.     At approximately 11:27 a.m., the CS contacted Your Affiant and advised him that FANNIN had advised the CS that FANNIN's source was still in court but that it shouldn't be too much longer. According to the CS, FANNIN had advised the CS that he (FANNIN) was expecting to hear from his source very soon.

2

11.     At approximately 12:33 p.m., the CS advised Your Affiant that FANNIN was in possession of the methamphetamine and was now ready to meet with SA Kelly. Moments later, FANNIN confirmed that he was ready in a text to SA Kelly. However, the investigators on surveillance had not observed any arrivals or departures from FANNIN's residence located at 370 Whitethorne Avenue that would indicate that FANNIN had received a shipment of methamphetamine.

12.     At approximately 12:39 p.m., TFO Mason observed FANNIN exit the house located at 370 Whitethorne Avenue wearing black pants and no shirt.

13.     At approximately 12:40 p.m., TFO Daron observed FANNIN go back inside his residence.

14.     At approximately 12:44 p.m., the CS advised Your Affiant that FANNIN was utilizing a different source of supply because FANNIN was unable to get ahold of his regular source of supply. Investigators now suspected that the shipment had not yet been delivered.

15.     At approximately 12:45 p.m., TFO Mason observed a shirtless FANNIN exit his residence while speaking on a cellular telephone. According to TFO Mason, FANNIN looked north along Whitethorne Avenue before then going back inside the house.

16.     At approximately 12:47 p.m., Your Affiant and TFO Wangler observed SA Kelly depart a pre-designated staging area and head towards Whitethorne Avenue.

17.     At approximately 12:55 p.m., TFOs Mason, Daron, Wangler, and Your Affiant observed SA Kelly arrive and park on the west side of Whitethorne Avenue across the street from FANNIN's residence.

18.     At approximately 1:08 p.m., FANNIN reaches out to SA Kelly via a text message and apologizes for the delay and advises SA Kelly that his supplier should be arriving any minute.

19.     At approximately 1:11 p.m., TFO Mason observed a black 2009 Mitsubishi Eclipse, bearing Ohio license plate JER7204, registered to Decoda CARR at 673 Duncan Road in Lucasville, Ohio 45648, arrive and park in front of FANNIN's residence on the west side of Whitethorne Avenue, directly in front of SA Kelly's vehicle. The driver of the black Eclipse was subsequently identified as Ryan Keith MOORE. It was also subsequently learned that an unidentified white female was seated in the front passenger seat of the Eclipse and a white male juvenile, who was later identified as MOORE's son, was seated in the rear passenger seat of the Eclipse. At this time, both of the passengers were not yet unobserved by investigators.

20.     At approximately 1:11 p.m., TFOs Daron and Mason observed a bare chested FANNIN, now wearing blue jeans, depart his residence located at 370 Whitethorne Avenue and walk towards the Eclipse before then turning around and walking back into his house.

21.     At approximately 1:12 p.m., TFOs Daron and Mason observed FANNIN again depart his residence and walk up to the open front passenger side window of the Eclipse. TFO Daron subsequently observed the white female adult seated in the front passenger seat. SA Kelly also

3

observed that FANNIN reached into his back left pocket and pulled out a small digital scale as he leaned into the front passenger side window of the Eclipse.

22.     At approximately 1:17 p.m., TFO Daron observed FANNIN walk from the Eclipse to SA Kelly's vehicle that was parked directly behind (to the north of) the black Eclipse. According to TFO Daron, FANNIN appeared to be carrying something in his hand as he walked towards SA Kelly's vehicle. According to SA Kelly, FANNIN was carrying the bag containing the purported methamphetamine, covered by a purple cloth, in his hand as he approached the undercover vehicle.

23.     Moments later, TFO Daron subsequently observed FANNIN get into the front passenger seat of SA Kelly's vehicle.

24.     At approximately 1:19 p.m., TFO Daron observed FANNIN get out of SA Kelly's undercover vehicle and walk back to the Eclipse. TFO Daron subsequently observed FANNIN hand something to someone inside the Eclipse through the open front passenger side window.

25.     At approximately the same time, TFO's Daron and Mason observed SA Kelly depart the area in the undercover vehicle.

26.     According to SA Kelly, once inside the vehicle, FANNIN handed him approximately 143.6 gross grams of a white crystalline substance, purported to be methamphetamine, which was contained inside a clear plastic bag. According to SA Kelly, he subsequently handed FANNIN the $2,400.00 in OAF as payment for the suspected methamphetamine.

27.     At approximately 1:21 p.m., TFOs Mason and Daron observed FANNIN walk away from the Eclipse and return to his residence. At approximately the same time, the same above listed investigators observed MOORE, the white female, and the juvenile depart the area in the black Eclipse travelling south on Whitethorne Avenue. By this time, investigators could tell that a white female adult was seated in the front passenger seat of the Eclipse. However, investigators were not yet aware of the male juvenile in the backseat.

28.     Surveillance was maintained on MOORE and the black Mitsubishi Eclipse after it departed the area.

29.     At approximately 1:22 p.m., DEA TFO David Barrick observed the Eclipse stop and the unidentified white female get out on the northwest corner of the intersection of Clarendon Avenue and Amherst Avenue in Columbus, Ohio. According to TFO Barrick, the white female had blonde hair and was wearing a black top and gray checkered pants. According to TFO Barrick, she walked northwest and subsequently disappeared from view. After dropping off the white female, the Eclipse continued north on Clarendon Avenue and then east on Springmont Avenue.

30.     At approximately 1:27 p.m., TFO Mason observed the Eclipse stop and park in the front yard of 1655 Thomas Avenue in Columbus, Ohio. According to TFO Mason, he observed MOORE get out of the Eclipse carrying a black and yellow satchel that was strapped across his chest. TFO Mason subsequently observed MOORE knock on one of the doors facing east and leading into the house located at 1655 Thomas Avenue.

31.     At approximately 1:34 p.m., TFO Mason observed a gray 2008 Ford Edge, bearing Ohio license plate JFX9060, registered to Alejandro MANCERA at 1655 Thomas Avenue in Columbus, Ohio 43223, arrive and park in the front yard of the above mentioned house, next to the Eclipse. After the Ford Edge arrived, TFO Mason observed MOORE get out of the Eclipse with the black and yellow satchel strapped to his chest. MOORE had apparently returned to his Eclipse unobserved after having been seen knocking on the door to 1655 Thomas Avenue earlier. TFO Mason subsequently observed the driver of the Edge, a medium complexioned white male, possibly Mexican, and MOORE walk up together to the house located at 1655 Thomas Avenue. According to TFO Mason, the unidentified driver of the Edge used a key to enter the house located at 1655 Thomas Avenue with MOORE.

32.     At approximately 1:37 p.m., TFO Mason observed both the unidentified driver of the Edge and MOORE exit the house together and then depart the area in their respective vehicles. Surveillance was maintained on the Eclipse after it departed 1655 Thomas Avenue.

33.     The Eclipse was subsequently surveilled to the Marathon gas station located at 1401 Sullivant Avenue in Columbus, Ohio 43223 where MOORE was observed conducting what appeared to be several hand to hand drug transactions. Columbus Police Department (CPD) patrol officers eventually stopped MOORE at 1536 West Broad Street in Columbus, Ohio for failing to signal in violation of Columbus City Traffic Code (CTC) 2131.14A. During the stop, officers learned that MOORE was driving with an expired Ohio driver license in violation of CTC 2141.12A1. Officers also glimpsed what appeared to be illicit drugs inside the partially unzipped black and yellow satchel that had been previously observed strapped to MOORE. It was also learned that the Eclipse was occupied by a juvenile white male whom MOORE would later say was "probably" his son. During a subsequent probable cause search of the satchel and the Eclipse, investigators subsequently discovered nearly one (1) pound of suspected methamphetamine, several ounces of suspected fentanyl, suspected drug proceeds, and a Glock 45, 9mm semi-automatic pistol. The suspected drugs, the suspected drug proceeds, and the Glock 45 were all seized and MOORE arrested on federal drug and gun charges.

34.     SA Cadogan conducted a presumptive field test from a sample taken from the suspected methamphetamine that was discovered in MOORE's possession. The sample subsequently tested positive for the presence of methamphetamine. This presumptive field test was witnessed by TFO Kevin Wangler.

35.     MOORE was subsequently advised of his rights as they pertain to the "Miranda Decision". MOORE agreed to waive his rights and speak with investigators. MOORE stated that the suspected white crystalline substance which tested positive for the presence of methamphetamine was in fact methamphetamine, and the white powder believed to be fentanyl was in fact fentanyl. According to MOORE, the pills in his possession were Percocet pills. MOORE also stated that earlier in the day, just prior to his arrest, he had obtained the Percocet pills from a tall Hispanic Male in the area of Thomas Avenue and Catherine Street. Investigators knew that the area that MOORE was describing was the house located at 1655 Thomas Avenue. MOORE described the Hispanic male as 6'0" tall with tattoos on his arms. This description closely matched the driver of the Ford Edge. According to MOORE, the Hispanic male worked for a Mexican drug trafficker

5

known as "Cali". According to MOORE, "Cali" was also tall and had tattoos on his arms. According to MOORE, the individual he met with worked for "Cali", but was not "Cali".

36.    MOORE stated that he believes "Cali" is in charge of a Mexican Drug Trafficking Organization (DTO) operating out of Columbus, Ohio. According to MOORE, he has, in the past, purchased pounds of Methamphetamine from this DTO. However, according to MOORE, the DTO was currently awaiting a shipment of drugs and was out of methamphetamine. MOORE stated that he normally uses "Cali's" DTO but had to purchase the methamphetamine he was found in possession of from a white male known as "Chad", as a result of "Cali" being out of "product".

37.    On May 18, 2021, at approximately 11:15 a.m., DEA special agents and task force officers established surveillance of the house located at 1655 Thomas Avenue. At approximately 1:20 p.m., investigators observed a thin young white male covered in tattoos walking north toward the TARGET LOCATION from the direction of Mound Street. This white male was subsequently identified. However, he will be listed here as a source of information (SOI).

38.    TFO Mason subsequently observed the SOI speaking with one of the young Hispanic males hanging out at 1655 Thomas Avenue before the Hispanic male escorted him into the house. This Hispanic male was subsequently identified as Douglas CASTILLO.

39.    At approximately 1:40 p.m., TFO Mason observed the second Hispanic male believed to reside inside 1655 Thomas Avenue arrive and walk into the house located at 1655 Thomas Avenue. This second Hispanic male was subsequently identified as Noe Martin BARRON. BARRON is tall, approximately 6'2" and is covered in tattoos. BARRON was much taller than the other Hispanic men hanging out at 1655 Thomas Avenue.

40.    At approximately 1:47 p.m., TFO Mason observed the SOI depart 1655 Thomas Avenue and subsequently walk west on Thomas Avenue.

41.    At approximately 1:55 p.m., TFO Jacob Smith and SA Zachary Bennett conducted a consensual non-seizure contact of the SOI in the area of Edwin Street and Safford Avenue as he/she was walking north toward Mound Street.

42.    TFO Smith asked for and received consent from the SOI to search his/her person and belongings for weapons and controlled substances. A subsequent search of the SOI revealed that he/she was carrying inside his/her wallet two bindles and a small baggie containing a white crystalline substance believed to be methamphetamine and a small bindle containing an off-white powder believed to be fentanyl. The SOI admitted to obtaining the suspected methamphetamine from a tall Hispanic male known as "Cali" who resides on Thomas Avenue. However, the SOI could not remember the address. The SOI claimed the suspected fentanyl was not a controlled substance.

43.    As mentioned earlier, MOORE also mentioned a tall Mexican trafficker known as "Cali" who was associated with the house located at 1655 Thomas Avenue.

6

44. Your Affiant conducted a presumptive field test of a sample taken from the suspected methamphetamine found in the SOI's possession. The sample subsequently tested positive for the presence of methamphetamine.

45. On May 18, 2021, United States Magistrate Judge Chelsey M. Vascura authorized a federal search warrant to search the house located at 1655 Thomas Avenue. The affidavit written in support of this search warrant was written by Your Affiant.

46. At the time this warrant was executed, Noe Martin BARRON was located inside the house located at 1655 Thomas Avenue. BARRON closely fit the physical descriptions of the trafficker known as "Cali" given by MOORE and the SOI. In addition, TFO Mason had earlier observed the arrival of BARRON at 1655 Thomas Avenue just prior to the SOI receiving a small amount of suspected methamphetamine.

47. Investigators subsequently discovered a large amount of U.S. currency in the north bedroom, along with small amounts of suspected methamphetamine and fentanyl, packaged for street level distribution. Investigators suspect that the currency seized was in the neighborhood of $60,000.00 in U.S. currency. During processing, BARRON advised Your Affiant that he resided at 1655 Thomas Avenue, and slept in the north bedroom whose windows overlooked Thomas Avenue. BARRON claimed that the currency discovered in his room did not belong to him. However, BARRON did not wish to speak with investigators concerning the suspected drugs found in his bedroom.

48. Investigators discovered a .38 caliber revolver in the living room and a 9mm semi-automatic pistol in the kitchen. Investigators also discovered approximately 460.6 gross grams of a white crystalline substance believed to be methamphetamine in the kitchen.

49. Your Affiant conducted a presumptive field test from a sample of the methamphetamine found in the kitchen. The sample subsequently tested positive for the presence of methamphetamine.

50. Fingerprint analysis of BARRON revealed that BARRON is wanted in Logan County, Ohio for failure to appear and that BARRON was previously arrested in Franklin County, Ohio for assault, improper handling of a firearm in a motor vehicle, carrying a concealed weapon, and possession of drugs.

## CONCLUSION

51. Based upon the information presented in this affidavit, there is probable cause to believe that beginning on or about April 8, 2021, in the Southern District of Ohio, Noe Martin BARRON, did knowingly and intentionally conspire with others, both known and unknown, to possess with the intent to distribute 50 grams or more of a mixture and a substance containing methamphetamine, a schedule II controlled substance, in violation of Title 21, U.S.C. § 841 (a)(1) and (b)(1)(A) (viii), and Title 21, U.S.C. § 846.

Christopher Cadogan, Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me this 19 day of May, 2021.

CHELSEY M. VASCURA
CHIEF UNITED STATES MAGISTRATE JUDGE

8